Hitchcock, J.
This is a bill in chancery from the county of Trumbull,
It is submitted to the court upon bill, answers, exhibits, and testimony, and presents merely questions of fact. '
The caso was fully argued by Newton, Birchard, Tod and Hoffman, for the complainant, and by Webb and Crowle, for the defendants.
On the part of the defendants several points of law were raised, but as in the view taken by the court of the case these points were not necessarily involved, they are not here stated.
It is stated in the bill in this case that on May 15, 1835, the de *416 fendant Remmington executed to the complainant a mortgage deed of sixty-five and one-half acres of land in the township of Bazetta, in the county of Trumbull, and also of one-half acre of land in the township of Mecca in the same county, to secure the payment of $756, in one year after the date of said deed. The land is specifically described. This deed was left for record on the 27th of May, and recorded on June 15, 1835. That through carelessness or design the deed when executed, was attested by 416] only one witness, and therefore not *a legal mortgage. And that no part of the money has been paid. The bill further charges that on June 19, 1835, the defendant Remmington combining with the defendant Doud, who is his father-in-law, to cheat and defraud the complainant, conveyed the sanie land by deed absolute to the said Doud, and that the said Doud well knew of the defendant’s mortgage at the time he received said deed, and that the defendant Remmington is now insolvent.
The defendants are called upon to answer, and the prayer of the bill is that the lands may be sold, and for general relief. The defendant Doud, in his answer, admits the indebtedness of Remmington to the complainant, and the execution of the mortgage, but denies that he had any knowledge of the same until September or October, 1835. He denies that any deed was executed to him by Remmington on June 19, 1835, but states that he has a deed of the sixty-five and one-half acres of land in Bazetta, executed by Remmington to him on the 19th January of that year; that at the time said deed was executed Remmington was indebted to him in the sum of $2,300 or thereabouts, and that he now holds his note for $1,370; u that the said deed was given to secure the payment of the first-named sum, and for no other purpose whatever,” and that it is the only security he has for the $1,370. That said deed was not recorded until August, 1835, and' the reason for not recording it sooner, was that the said Remmington not wishing his creditors to know of its execution, desired him to withhold it from record, promising at the same time, to pay him ^what he owed, but failing to do so but in part, he finally had the deed recorded. Ho states that he has no claim to the land in Mecca, but insists that his title to the sixty-five and one-half acres is complete and perfect. He denies all fraud, etc.
Remmington’s answer contains little except that he received but $700, for which he gave his note payable one year after date for *417, 418 $756, secured by mortgage. That he has since offered to pay the *$700, which Lake refused- to receive; that Lake is indebted [417 to him on account, and that the one-half acre of land in Mecca is abundantly sufficient to secure the debt.
The deed is attached to and made part of the answer, and ap- .• pears to be an unconditional deed, the consideration expressed being $550.
Tod, who appears to have been made a defendant long after the bill filed, and, at his own request, claims title to the one-half acre of land in Mecca, by purchase at sheriff’s sale. Ho says that he had full knowledge of the complainant’s claim, having filed the bill and prosecuted the claim as his counsel. That at the February term of the court of common pleas of Portage county, a judgment was recovered in favor of Spencer and Sharp, against Remmington and one Roberts, for $1,822, and that he, as counsel for the judgment creditors, caused an execution on said judgment to be levied on the said one-half acre of land in Mecca, as the property of Remmington, entertaining doubts as to the legality of the plaintiff’s mortgage. That he purchased said land at sheriff’s sale for the sum of $466.66, which sale was confirmed by the court, and he has received a deed from the sheriff, and holds the title in trust for Spencer and Sharp, having purchased the land as their attorney.
.Many witnesses have been examined and much testimony taken in the case. The relevancy of much of this testimony is not perceived. On the part of the complainant, it is proven that the deed, under which the defendant claims, was executed at Mecca, and that the magistrate who took the acknowledgment resided eight or nine miles from that place, and that at the time the acknowledgment was taken he was requested to keep the matter secret. These facts are proven by the magistrate who took the acknowledgment. He states further that the deed was prepared by Remmington when he arrived at the house, and that it was attested by him and a daughter of Doud. At the same time there was a magistrate residing within a few rods of Remmington’s house, where the deed was executed. *He states further, [418 that at the time he was suspicious that all was not right, but that he had at other times been requested to keep such things ■secret. That he resides about one and a half miles from Doud, who requested him to go and take the acknowledgment, and that *419 he frequently had done such business for Doud; that Remmington remained in possession of the land, receiving the rents and profits. And also, at or about the same time this deed was executed, he took the acknowledgment of another deed from Remmington to Doud, of the one-half acre of land in Mecca. It was proven that this last deed was subsequently given up and canceled. There is no evidence in the case that Remmington had ■any other land, except a parcel for which he had contracted and paid a part of the purchase money, and which was subsequently, by his order, conveyed to Doud, he paying the balance of the purchase money.
On the part of the defendants, witnesses have been examined to prove the indebtedness of Remmington to Doud, and the note of $1,370 is in evidence. It bears date at Yernon, August 10, 1835.' The principal witness examined to this point is Lucas Doud, a son of the defendant Doud, and he has been examined a number of times. He states that Remmington and himself had been partners in mercantile business; that they dissolved partnership, and sold out their goods to. one Yietts, in February or March, 1835; that they commenced business with a stock of goods which they purchased of their father, and at the time of dissolution wore indebted to him $2,300 or $2,400. The indebtedness was made up of the following items: Groods originally purchased, $850 or $900; cash, $400, $300 of which had been given to the witness by his father at the time of his setting out in business, and i§100 lent to the firm; $525 lent to the firm ; butter and cheese during two years sold to the firm, amounting to about $300; two barrels of pork, $24; cash lent, $200; patent clock, worth $12; flour and boards, amount unknown. None of this 419] had been paid, except as Doud had ^traded with the firm to the amount of $75 or $100, he having paid in hand, at the time of trading, for small articles in butter and cheese. At a subsequent examination the witness increases this indebtedness by other items amounting to $275. He says that at the time of the dissolution of the partnership they sold their goods, then on hand, to Yietts, for $750, and took a note payable to Samuel Doud. Yietts states that the amount given for the goods by himself was $762, which has been paid to Doud, the defendant; and that at the time he made the purchase he understood that Remmington and Doud were indebted to Samuel Doud beyond this amount. Lucas *420 Doucl also states that the firm was owing about $4,000, and had due to them about the same amount. Although the partnership was dissolved in February or March, 1835, no settlement took place as between the partners until August of the same year, when he agreed to collect $900 or $1,000 of the debts, and pay one debt in Pittsburg, amounting to about $1,000-. Remmington was to collect the other debts due the firm, and pay the other claims against it. • In pursuance of this arrangement the note for $1,370 was executed to his father.. He states further, that claims due the firm and assigned to his father, amounting to about $600, were put into the hands of a magistrate to collect, and when collected he received to his own use $500 of the avails, and his father received the balance. There is further testimony, that in 1835, claims of the firm amounting to $500 or more, were assigned to Samuel Doud, and put into the hands of Justice Sperry for collection, but when collected, the money was paid over to Remmington and Lucas Doud. It is stated by Justice Benton that Remmington and Doud were transacting business together; they left notes to a considerable amount with him for collection, all assigned to Samuel Doud; but when collected the avails were paid over to Remmington and Lucas Doud. In 1837, Remmington deposited with Justice Bascum a large amount of claims for collection, with ^directions to pay from the avails some specific [420 debts, and to pay the balance to Samuel Doud. During the progress of the case it was referred to a master to institute an inquiry as to the consideration of deed from Remmington to Samuel Doud, and the latter was called upon to exhibit his account against Remmington, or against the firm of Remmington and Doud, but exhibited no account and no claim, except the note of $1,370, stating that he trusted to the honesty of Remmington and Doud to keep the accounts, and this statement is confirmed by the testimony of Lucas Doud.
Such arc the substantial and leading facts of this ease as they appear from the bill, answer, exhibits, and testimony, and the great inquiry arising upon these facts is, whether the deed given by Remmington to the defendant Doud, in January, 1835, was given in good faith, or whether it was done to defraud creditors, and of course void as to such creditors and subsequent purchasers. In examining a question of this kind every circumstance connected with the transaction must be carefully considered. Fraud is never *421 presumed, but must be proved. But, in making proof, greater latitude must be given than in ordinary cases. Honesty is open and fair, while fraud seeks concealment. To cover it, statements, which, if not entirely false, yet deceptive, will be made, and the truth itself concealed. A man who has been guilty of a fraudulent transaction, although called upon to answer under oath, will rarely confess it. If he does not absolutely deny, he will evade, and give a false coloring to the transactions in which he has been engaged. Yet, athough there may be a general denial of fraud in an answer in chancery, yet it not unfrequently happens that the facts stated in such answer leave no doubt of the existence of fraud.
In the case before the court, the defendant Doud is charged in the bill with having been guilty of a fraud in receiving a deed from his son-in-law Remmington, with intont to defeat the just claims of the creditors of that son-in-law; and he is called upon 421] to answer that allegation. In his answer he ^denies this fraud, and undertakes to give a true history of this transaction verified by his oath. Ho states, that at the time of the execution of this deed, which was on January 19,1835, Remmington was indebted to him in the sum of $2,300 or $2,400, and that the deed which was then executed, although absolute upon its face, was intended merely to secure the payment of this indebtedness. That at the request of his son-in-law he withheld this deed from record, having confidence in his son-in-law that he would satisfy this debt, and his son-in-law being fearful that if the deed was put on record it would alarm his creditors, and induce them to push their claims against him. That his debt against Remmington was reduced to $1,370, for which a note was given in August, 1835, at which time, having become apprehensive that he should not get his pay, he got the deed recorded.
Now, this statement is tolerably fair upon its face, although it looks as if there was something, at least a little, wrong, in concealing from the creditors of his son-in-law the fact that he had "got a deed of his property, that son-in-law continuing at the same time in business as he had done before. It might deceive those creditors, and might possibly induce other persons to give a credit which they would not have done had the fact been known. And it is not readily perceived why, if he had that confidence in his son-in-law which he professes to have had, he should have been anxious to take the deed at all.
*422 Passing over these matters for the present, I remark that the defendant, having undertaken to give an account of his transaction, was bound to tell the truth. If it was fair and honest, a plain narrative of facts was all that was necessary, and if there has been any misrepresentation, any concealment, any evasion, any deception, it must operate strongly against the defendant. It is worthy of remark, that although it is stated in the answer, that Remmington was indebted, nothing is said as to the nature of this indebtedness, or of its origin. But is it true that Remmington was indebted to the defendant at the *time of the execution [422 of this deed? The defendant avers it, and he has attempted to sustain his answer by proof. And this proof makes a case entirely different from that stated in the answer.
The answer states that Remmington was indebted $2,300 or $2,400, and that the deed was executed to secure the payment of this amount. There is no evidence that Remmington was indebted individually a single cent, but the proof is, if the testimony can be relied on, that Remmington and Doud were indebted in this amount. Not, however, at the time of the execution of this deed, but in February or March following, when the firm was dissolved. Whether any part of this indebtedness accrued after the date of the execution of. the deed, we are not informed, for in this case woare left without date as to any part of the claim of Doud against the firm, except as to the first items. Now whether the firm of Remmington and Doud were indebted to Samuel Doud is not perhaps of much consequence. The testimony is vague and uncertain. The principal witness is very indefinite in his recollections. It was about $2,300 or $2,400. It was about such a sum or such a-sum. The account of -the firm against his father was about $75 or $100. I incline to the opinion, however, that they were indebted-to some amount; the extent is altogether uncertain.
But the case made in evidence is entirely different from that made in the answer. In the answer, Remmington is made the-debtor, by the evidence of Remmington and Doud. If the intention was to secure a debt due from this firm, why not state it? Why set up a different pretense? Will it be said if the firm were indebted, each individual member of the firm was holden for the debt? This is true, and had the fact been stated in the answer as it would appear from the proof to have existed, it would have been equally well'-for the defendant. He had precisely the same- *423, 424 right to take a deed from Rommington, to secure a partnership, as 423] an individual debt. But not having so ^stated in his answer, he has been guilty of deception and misrepresentation. And this circumstance goes to throw strong suspicion upon the transaction.
Who are Remmington and Doud? The son and son-in-law of the defendant. This, then, was a family transaction, and must be subjected to the closest scrutiny. While in business together, they employed a magistrate to make collections. The notes deposited for this purpose were all assigned to the father, but, when collected, the avails were received by the members of the firm. So after the dissolution of the partnership they deposited claims for collection with another magistrate, all assigned in the same manner, but, when collected, the money was received by the partners. This is not according to the ordinary mode of transacting business, but perhaps there is nothing in it which would go to implicate tho defondant.
There is, however, another circumstance disclosed, which is not so readily disposed of. At or about tho time the deed in controversy was executed, another deed was executed covering the one-half acre of land in Mecca with its appurtenances. With respect to this deed not one word is said in the answer. We know not for what purpose it was given, nor for what consideration. It is not sufficient for the defendant that this deed was afterward given up and canceled. As an honest man he ought to have stated in his answer that this deed was executed, and why it was executed, the consideration, and why it was subsequently given up and canceled. There is every reason to believe that it was a part oí the same transaction, and this concealment, on tho part of the defendant, is calculated to excite suspicion.
What other circumstances are disclosed which go to throw sus•picion upon this transaction ? At the time of the execution of this deed, Rommington, the grantor, was residing in Mecca, in his house upon the one-half acre of land. Within four rods of this house was residing a magistrate authorized to take the acknowledgment of deeds.' But instead of applying to him for the purpose of taking tho acknowledgment, another is called from a 424] distance of eight or nine miles to do this business. *And this magistrate thus called, and a daughter of the grantee, are the .only witnesses to the execution, of tho deed, excepting the parties *425 to it. Added to this we have the testimony of the magistrate taking the acknowledgment, that he was requested to keep the whole matter secret. It is not surprising that he should have been, as he says he was, under the impression’ that all was not right. And how any person made acquainted with all these circumstances could have entertained a different opinion, I can not conceive.
It is proper, too, to inquire, why, if this deed was intended to operate as a mortgage, was it not so expressed? And if the intention was to secure the payment of $2,300 or $2,400, why is the consideration expressed $550 and no more ? These circumstances of themselves are of little moment, but in a case-where suspicion is so justly excited, may with propriety be named.
The deed was executed in January and was not recorded until August, 1835. And according to the statement of Doud in the answer, it was thus withheld from record at the request of Remmington, for fear that if recorded it might injure his credit, or at least that his creditors might- be induced to press their claims against him. Creditors were then in the contemplation of the parties, they were talked about, and if the intent was not absolutely to defraud, it certainly was to deceive them. And the course pursued was calculated to give to Remmington a false credit, and it had this effect. Upon the strength of his appealing to be the owner of this land, he was enabled to procure money from this complainant, which there is no probability that he could have done had the fact been known that the land had been conveyed to his father-in-law.
Considering all these circumstances, the relation between the parties, the secret and unusual manner in which the deed was executed, the request made of the magistrate to keep it secret, the length of time it was withheld from record, and the reason-assigned for thus withholding it, the-falsity and deceptive character of the answer when compared with the testimony of the case, and the whole current of transactions *between the parties, [425 we are irresistibly led to the conclusion that this deed could not have been made and received in good faith, but that it was in fact fraudulent as to creditors and subsequent purchasers, and as to them is therefore void.
A question is made by defendant’s counsel whether the deed of the complainant, not being a legal mortgage, can be enforced. *426 Of this I suppose there can be no doubt. This, although not a legal, is an equitable mortgage, and may be enforced in equity. And the lien of such mortgage, according to the decision of this coui’t in the case of the Bank of Muskingum v. Carpenter, 7 Ohio, 21, will in equity be preferred when of prior date to a judgment lien.
The defendant, Tod, does not claim any interest in the property as against the complainant, but insists that the land in Bazetta should be first sold to satisfy the mortgage, which, if sufficient will leave his title clear to the one-half acre in Mecca. A decree may therefore be taken that, unless the debt due the complainant shall be paid within some short period, all the lands covered by his mortgage shall be appraised, and the sixty-six and one-half acres in Bazetta first sold.
If this is sufficient to discharge the mortgage debt and costs of suit, no further proceedings to be had; but if not sufficient, then the one-half acre in Mecca to be sold. If, upon the sale of the land in Bazetta, there should be a surplus of money remaining in the hands of the officer after satisfying the mortgage debt and costs of suit, that surplus to be paid over to the defendant Doud. If a surplus upon the sale of the land in Mecca, that surplus to ,be paid over to the defendant Tod.